**In re the MARRIAGE OF Kristi C. McINTOSH and Cody L. McIntosh.**

**Kristi C. McIntosh, Petitioner–Respondent,**

v.

**Cody L. McIntosh, Respondent–Appellant.**

**No. 25510.**

Missouri Court of Appeals,
Southern District,
Division One.

Jan. 29, 2004.

Patrick W. Rodery, Mountain Grove, for appellant.

Randy R. Cowherd, Jeffery W. Laney, Springfield, Christopher D. Wade, Ava, for respondent.

PHILLIP R. GARRISON, Judge.

This appeal is from an amended judgment and decree of dissolution of marriage. The case, with its unusual procedural history, raises issues concerning the effect of a spouse's death on a pending action for dissolution of marriage, and the trial court's power to subsequently enter a judgment *nunc pro tunc*.

## Statement of Facts

Kristi C. McIntosh ("Kristi") and Cody L. McIntosh ("Cody") were married on July 11, 1987, and had two children before Kristi filed a petition for dissolution of marriage on August 8, 2000. That case was tried to the court on March 13, 2001. At the close of the evidence, the trial court stated on the record its belief that there was enough evidence to indicate that the marriage could not be preserved, and that the court was "going to dissolve it" and "take the matter of property division under advisement." The court ruled that the custody arrangements then in place would remain in effect and, in conclusion, said, "The marriage is dissolved, the Court takes matters of division of property under advisement until April the 3rd [2001]."

On the same day, the court utilized a printed form entitled "Docket Entry," which contained various potential findings that could be adopted by placing a mark beside the printed entries. The entries checked by the trial court in this case stated that the petition had been on file for thirty days, that Kristi had been a resident of Missouri for more than ninety days preceding the filing of the petition, that there was no reasonably likelihood that the marriage could be preserved, that the marriage was irretrievably broken, that joint custody of the children was granted to the parties with Kristi to have primary physical custody "as per formal order," that neither party was to pay maintenance to the other, that "marital property and debts [were to be] divided as per formal order," and that costs were taxed against Kristi. The court also wrote in the docket entry that "[d]ivision of property [was] taken under advisement." The trial court did not place a mark next to a box denominated "Judgment and Decree of Dissolution of Marriage ordered."

Kristi died on May 13, 2001, before the trial court took further action. On May 31, 2001, Cody filed a "Motion To Abate and Dismiss Dissolution Action" based upon Kristi's death. On June 15, 2001, the trial court overruled that motion in a written order that also stated that "the marriage of the parties [was] dissolved." We dismissed Cody's appeal of that order for lack of a final, appealable judgment, and because there had been no substitution of parties.

On March 20, 2002, after the dismissal of the first appeal, Kristi's attorney filed a "Suggestion of Death" and requested that the trial court substitute as a party Kristi's estate, Eugene Caudle, Personal Representative ("Respondent"). On April 2, 2002, the trial court entered an order substituting Respondent as petitioner in the dissolution action.

On April 24, 2002, the trial court entered a written "Judgment and Decree of Dissolution of Marriage" showing Respondent as a party and stating that the judgment was effective retroactive to March 13, 2001 (the date of the hearing of the dissolution suit), but also ordering that the marriage was "dissolved as of May 13, 2001" (the date of Kristi's death). The judgment did not provide for custody or support of the parties' children (other than to approve a parenting plan that is not included with the copy of the judgment in the legal file here), and stated that "all matters of property division [were] taken under advisement."

On August 13, 2002, Respondent filed a "Motion to Correct Clerical Mistake in Judgment Pursuant to Rule 74.06(a)," noting therein that the trial court, at the conclusion of the dissolution trial, had stated that "the marriage [was] dissolved," but had failed to check that entry on the printed docket entry form. The trial court, in response to this motion, entered a "Judgment and Decree of Dissolution of Marriage *Nunc Pro Tunc*" ("*Nunc Pro Tunc* Judgment") on February 4, 2003 stating, "Now on this 13th day of March, 2001, comes [Kristi] in person and by her attorney," and containing an order that the marriage was dissolved. The judgment also ordered Cody to pay child support in the amount of $344 per month beginning June 1, 2001 and to provide health insurance for the children, ordered that each of the parties could claim one of the children as a deduction on his or her tax returns, ordered the parties to notify each other in writing at least sixty days prior to a proposed relocation of the principal residence of the children, ordered that Cody be awarded specifically described "marital real property," ordered Cody to pay "Petitioner" $42,000 and all outstanding credit card debts, awarded "Petitioner" fifty shares of First Banchares, Inc., and ordered that each party shall keep any other items in his or her possession.

Without further explanation in the record, the trial court, on February 7, 2003, entered an "Amended Judgment and Decree of Dissolution of Marriage" that, except for the title, was exactly the same as the judgment entered *nunc pro tunc* three days earlier. It is from that amended judgment that this appeal flows.[1]

### Abatement of the Dissolution Action

In his sole point on appeal, Cody contends that the trial court erred in "entering judgment" because Kristi died before the marriage was dissolved, resulting in abatement of the dissolution action, and that, as a result, the trial court lost jurisdiction to enter a judgment of dissolution.[2] For the reasons discussed below, Cody's point is denied.

The general rule in Missouri has been that an action to determine the issue of marital status abates upon the death of either party to the action. *See In re Marriage of Carter*, 794 S.W.2d 321, 322 (Mo. App. S.D.1990) (citing *State ex rel. Dubinsky v. Weinstein*, 413 S.W.2d 178, 181 (Mo. banc 1967)); *Bakker v. Employee Sav. Plan of McDonnell*, 919 S.W.2d 16, 18

---

1. As previously indicated, the trial court, by order on April 2, 2002 and in its judgment of April 24, 2002, substituted Respondent for Kristi upon suggestion of her death. Notwithstanding said substitution, both the *Nunc Pro Tunc* Judgment and the subsequent amended judgment from which this appeal flows revert to naming Kristi as a party (presumably because those judgments seek to dissolve Kristi's marriage as of a date prior to her death). We are cognizant that the notice of appeal and, as a result, the caption of this case, also name Kristi as a party in apparent conflict with the fact of Kristi's death and the substitution of Respondent. Nonetheless, in keeping with the trial court's substitution of Respondent for Kristi in this action, we refer at times herein to the arguments, or lack thereof, of "Respondent" despite the fact that Respondent is not listed as a party to this appeal.

2. In this regard, it is important to note that the only issues for consideration on appeal are those stated in the point relied on; those issues not contained therein are deemed abandoned. *McNear v. Rhoades*, 992 S.W.2d 877, 886 (Mo.App. S.D.1999). Therefore, except to the extent that we perform the required *sua sponte* review of jurisdiction, we do not decide other issues presented by the procedural history of this case. *See Cook v. Cook*, 97 S.W.3d 482, 485 (Mo.App. W.D. 2002); *Bledsoe Plumbing and Heating, Inc. v. Brown*, 66 S.W.3d 169, 171 (Mo.App. W.D. 2002).

(Mo.App. E.D.1996) (holding that there was abatement of a dissolution action upon the death of either spouse prior to the entry of a "final judgment").

As to the effect of such abatement, we are cognizant of the numerous cases holding that abatement "is a destruction of the cause of action," and that upon the death of a spouse before judgment there is no res for a decree to operate upon and the issue of marital status becomes moot. *Cregan v. Clark*, 658 S.W.2d 924, 926–27 (Mo.App. W.D.1983). The death of a spouse prior to a decree by the trial court causes "the immediate abatement and final termination of the dissolution proceeding," with the result that a court does not have power thereafter to substitute parties. *Parkhurst v. Parkhurst*, 799 S.W.2d 159, 161 (Mo.App. E.D.1990). Furthermore, orders entered in a dissolution action after a spouse's death but prior to the entry of a judgment of dissolution are "void." *Bakker* at 18.

However, in *Linzenni v. Hoffman*, 937 S.W.2d 723 (Mo. banc 1997), our supreme court, in a dissolution of marriage suit, held that it was not necessary that a judgment meeting the qualifications of a final, appealable judgment pursuant to the provisions of Rule 74.01(a)[3] be entered prior to the death of one of the spouses in order to avoid abatement of the action. *Id.* at 726. Rather, the court held that Rule 74.01(a), which defines a "judgment," is procedural, whereas the issue of abatement is a matter of substantive law, and that "under the policy of our dissolution of marriage act, the doctrine of abatement is inapplicable where a dissolution of marriage has been ordered prior to the death of a party, even though the order may be partial, interlocutory or not a final judg-

ment resolving all issues in the case." *Id.* There, the court found that the marriage under consideration was "ordered" dissolved, and that there was no abatement where the trial court signed a written "work sheet" stating that the marriage was "ordered dissolved" and signed a letter to counsel ordering the marriage dissolved, all before the death of one of the parties. *Id.*

In the instant case there was no final judgment that the marriage was dissolved entered prior to Kristi's death, and, in contrast to the facts in *Linzenni*, there was no written order dissolving the marriage. Accordingly, Cody contends that the entire suit abated, notwithstanding the holding in *Linzenni*. Respondent does not contend otherwise, but argues that the *Nunc Pro Tunc* Judgment provided the previously missing finding in the docket entry that the marriage was dissolved, and thereby cured the abatement pursuant to *Linzenni*. The question then becomes whether a trial court may enter a *nunc pro tunc* order after a suit has abated and, thereby, cure the previous abatement.

### Nunc Pro Tunc Judgments

■ An analysis of Cody's contention is perhaps best initiated with a brief statement of the law concerning judgments and orders *nunc pro tunc*. The common law concept of *nunc pro tunc* judgments is codified in Missouri by way of Rule 74.06(a), which states that

[c]lerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the

---

**3.** References to rules are to Missouri Rules of Civil Procedure (2003) unless otherwise indicated.

motion of any party and after such notice, if any, as the court orders.

There is a long line of cases establishing a well-defined and limited scope to such orders. In *Pirtle v. Cook*, 956 S.W.2d 235 (Mo. banc 1997), our supreme court stated:

> It is universally held that the only true function of a *nunc pro tunc* order is to correct some error or inadvertence in the recording of that which was *actually done,* but which, because of that error or omission was not properly recorded; and, that it may not be used to order that which was *not* actually done, or to change or modify the action which was taken.

*Id.* at 240 (quoting *City of Ferguson v. Nelson,* 438 S.W.2d 249, 253 (Mo.1969)); *see also In re Marriage of Royall,* 569 S.W.2d 369, 371 ("The purpose of the *nunc pro tunc* amendment is to make the record conform to what was actually done where there is a basis in the record for the amendment."). The record must indicate that the intended judgment is different from the one actually entered. *Javier v. Javier,* 955 S.W.2d 224, 226 (Mo.App. E.D. 1997).

Thus, the power to issue an order or judgment *nunc pro tunc* constitutes no more than the power to make the record conform to the judgment already rendered; it cannot change the judgment itself. *Pirtle* at 240. " 'The purpose of the *nunc pro tunc* amendment is to make the record conform to what was actually done.' . . . [A]n order *nunc pro tunc* may be used only to correct a clerical error in entering a rendered judgment, it may not be used to alter or amend the rendered judgment." *Id.* at 241 (quoting *Unterreiner v. Estate of Unterreiner,* 899 S.W.2d 596, 598 (Mo.App. E.D.1995)).

"*Nunc pro tunc*" means "now for then." *Miller v. Varity Corp.,* 922 S.W.2d 821, 824 (Mo.App. E.D.1996);

BLACK'S LAW DICTIONARY 1218 (7th ed.1999). In keeping with that definition, the legal effect of an order or judgment *nunc pro tunc* relates back to an original judgment, and does not constitute a new judgment. *Pirtle* at 241 (citing *Abbott v. Seamon,* 217 S.W.2d 580, 587 (Mo.App.Spfd.Dist.1949) (an order *nunc pro tunc* does not change the judgment and, when made, its legal effect relates back to the date the judgment was actually made)); *see also Cruces v. State,* 452 S.W.2d 180, 182 (Mo.1970) (judgment *nunc pro tunc* related back to the original judgment entry). In the instant case, then, the legal effect of the Nunc Pro Tunc Judgment, if entered appropriately, would relate back to March 13, 2001, the date the trial court announced that the marriage was dissolved and completed the docket entry that was the subject of the motion seeking a *nunc pro tunc* order.

### Nunc Pro Tunc Orders Following Abatement

Arguing that the *Nunc Pro Tunc* Judgment worked a reversal of the previous abatement of Kristi's dissolution petition, Respondent relies heavily on *Pirtle.* In that case, our supreme court held that "a court is considered to have continuing jurisdiction over its records," and that "[t]his jurisdiction exists independently from the court's jurisdiction over its cause or its judgment." *Id.* at 240. The court further stated that "[t]he [trial] court had lost its jurisdiction of the case, but not of its records" in concluding that "[t]he correction of the record can be made at any time regardless of whether the court has jurisdiction over its cause." *Id.* at 240 (citing *DeKalb County v. Hixon,* 44 Mo. 341, 342 (1869)); *see also Javier* at 225.

The question whether a judgment *nunc pro tunc* may "cure" the prior abatement of a suit also appears to be answered

413

affirmatively in *Clark v. Mississippi Valley Trust Co.*, 357 Mo. 785, 211 S.W.2d 10 (1948), a case involving a suit brought by a trust beneficiary against the trustee of the trust. The case was submitted to the trial court on July 8, 1946, and the beneficiary died on August 5, 1948. *Id.* at 12. The defendants contended that the cause was extinguished by the beneficiary's death, but at the request of the beneficiary's attorney, the trial court entered a decree *nunc pro tunc* as of the date the cause was submitted to the court. *Id.*

■ On appeal, the defendants in *Clark* contested the *nunc pro tunc* decree as well as a trial court order substituting the personal representative of the beneficiary as a plaintiff. The supreme court held that: the trial court was right in ordering the substitution of the personal representative as plaintiff.... The *nunc pro tunc* entry of judgment, if proper, had the legal effect of a rendition of a judgment in [the beneficiary's] lifetime.... Although, assuming as defendants contend, the claim is not such as would survive a plaintiff's death, yet the action did not abate, since the claim became merged in the judgment entered as of a date prior to the death.

*Id.* at 13 (internal citations omitted). The court proceeded to review the merits of the beneficiary's claim, "assum[ing] [that] the *nunc pro tunc* entry of judgment was proper." *Id.* On the basis of the holdings in *Clark* and *Pirtle*, we find that the *Nunc Pro Tunc* Judgment, if otherwise proper, served to rectify the flaw in the trial court's docket entry and, based upon *Linzenni*, prevented the abatement of Kristi's petition.

### The Record Required to Support the Entry of the Nunc Pro Tunc Judgment

The next question we must consider is whether the record before us supports the contention that the *Nunc Pro Tunc* Judgment was appropriate, i.e., whether there existed a clerical discrepancy between the judgment rendered by the trial court and the record of that judgment.

■ An error, to be corrected by a *nunc pro tunc* order, must be discernible from the record. *Pirtle* at 243. The nature of the record that will support a *nunc pro tunc* order has been variously described in previous cases. For example, in *Javier*, the court held that to warrant the use of a *nunc pro tunc* order, the correction must be supported by a writing in the record indicating the intended judgment. *Id.* at 226; *see also Johnson v. Johnson*, 654 S.W.2d 212, 213 (Mo.App. E.D.1983). In *Dobson v. Riedel Survey & Engineering*, 973 S.W.2d 918 (Mo.App. W.D.1998), the court stated that parol evidence will not support an order *nunc pro tunc*, and that there must be a source supporting the order in the court's record or papers. *Id.* at 921; *see also County Asphalt Co. v. Demien Const. Co.*, 14 S.W.3d 680, 683 (Mo.App. E.D.2000) (clerical error to be corrected must be discernible from the record; there must be some writing in the record which shows the judgment as actually rendered; parol evidence will not support an order *nunc pro tunc*).

The record as it appears before us raises the subsequent and obvious question whether the transcript of a trial court's comments may serve as a basis for an *order nunc pro tunc*. In *Royall*, the court held that the court may search the "record" for evidence of what happened. *Id.* at 371. By way of clarification, the court in *Fields v. Fields*, 584 S.W.2d 163 (Mo. App. W.D.1979), held that the court may look to the "entire record" to ascertain the judgment actually rendered as contrasted with the judgment entered. *Id.* at 165;

*see also Dobson* at 922–23 ("whole record" to be examined to determine propriety of *nunc pro tunc* order; court noted that since the case involved an associate circuit court proceeding, no record was required).

In *In re Marriage of Rea,* 773 S.W.2d 230 (Mo.App. S.D.1989), this court reversed the entry of an order *nunc pro tunc* that was based on the transcript of a wife's trial testimony concerning the parties' intention in entering into a written separation agreement. The *Rea* court likened a request to issue an order *nunc pro tunc* implementing that agreement to a request at the dissolution hearing where a spouse requested that the trial court insert a term into a written agreement, a request that obviously could not be honored. We then stated that

> [i]n sum, there is no entry, minute or notation in the record and no paper on file showing that the circuit court's judgment ... was that [husband] would pay [wife] the $100,000 in ten equal annual installments. An order correcting a judgment *nunc pro tunc* can be made only upon evidence furnished by the papers and files in the cause, or in the clerk's minute book, or on the judge's docket. The only paper supporting [wife's] request is the transcript of her testimony but, as explained earlier, a court record cannot be corrected *nunc pro tunc* on parol proof from sources other than an entry, minute or notation in the case record or some paper on file in the case.... Parol evidence is oral or verbal evidence; that kind which is given by word of mouth; the ordinary kind of evidence given by witnesses in court.... The fact that [wife's] testimony at the dissolution hearing was transcribed on paper by the court reporter

at a later date does not change the fact that [wife's] testimony was oral evidence upon which she now seeks to base her claim for *nunc pro tunc* relief.

*Id.* at 234–235 (internal citations omitted).

*Unterreiner* also involved a dissolution decree amended by a *nunc pro tunc* order. There, the parties testified at the dissolution hearing concerning their oral settlement agreement, which the trial court found to be "acceptable." *Id.* at 597. The trial court also announced that it would sign a judgment setting out what had been testified to, and the court did in fact sign a decree purporting to do so. *Id.* The decree described an agreement that the husband would pay the wife $1,000 per month for sixty months as maintenance. *Id.* The husband died after the decree was entered and the wife filed a motion requesting that the decree be corrected *nunc pro tunc* to state that the judgment mandated that the maintenance order would not terminate upon the death of her husband.[4] *Id.* The trial court relied upon the transcript of the dissolution hearing in granting the wife's motion and corrected the judgment's maintenance provision to provide that maintenance was not modifiable for any reason, including the death of the husband. *Id.* The husband's estate appealed, contending that the *nunc pro tunc* order was improperly based upon parol evidence and not supported by an entry, minute, or notation in the record or paper in the file, and that there was no clerical error in the original decree. *Id.*

The eastern district of this court held that the trial court "could properly examine a court reporter's transcription of the parties' stipulation in order to determine whether a mistake was made in entering

4. Section 452.370.3, RSMo (2000), provides that, unless otherwise agreed in writing or expressly provided for in the decree, a maintenance obligation terminates upon the death of either party.

the Decree and a *nunc pro tunc* order should be entered." *Id.* at 599. The court declined to discuss in detail the cases holding that a *nunc pro tunc* order may not be based upon parol evidence, but did acknowledge *Rea* and the "broad language" employed therein. *Id.* In distinguishing *Rea* from the facts then before the court, the *Unterreiner* court pointed out that the record before the court revealed that the agreement was written and the testimony offered by the wife in support of her motion was not a part of the rendered judgment, and was parol to a writing setting out the entire agreement. *Id.* at 599.

It is important to note that in the instant case, unlike in *Rea* and *Unterreiner*, while the basis of the *nunc pro tunc* order is found in the transcript, we are here concerned with the statements of the trial court itself in expressing its decision, rather than the transcribed testimony of one or more of the parties. In this regard, the question before us is more directly addressed by the holding in *Young v. Young*, 165 Mo. 624, 65 S.W. 1016 (1901), a case involving a *nunc pro tunc* judgment based upon an oral pronouncement by the trial court. The issue in *Young* was whether a California court had correctly entered a decree of dissolution *nunc pro tunc* after the death of the husband. *Id.* at 1017. The case was tried to the court on September 4, 1897, at which time the judge announced orally from the bench that he "would" grant the husband a dissolution of marriage, and award custody of a child to the wife, but would decide the issue of child support when he signed the findings. *Id.* The husband died on September 7, 1897, and the issue on appeal was whether the trial court had the power to enter a *nunc pro tunc* decree as of September 4, 1897.

The Supreme Court of Missouri held that no such authority existed, noting that the only evidence concerning what occurred was the testimony of the attorneys in the case and the decree itself. *Id.* at 1017. The court said that the parol testimony in that case was wholly incompetent, and noted that *nunc pro tunc* judgments can be entered only where there is something in the record which furnishes a basis by which to amend a judgment. *Id.* Even if the parol evidence had been admissible, the court stated that it showed that the trial court had not arrived at a final determination of the case, in that it had not decided the issue of child support and attorneys fees until after the husband died. *Id.* The court held that the trial court's announcement of September 4, 1897 did not amount to a judicial determination, and that under California law, the court could not have made a "final judgment" unless or until it issued a written finding or those findings were waived. *Id.* at 1018. The court concluded that "the divorce case ... abated on September 7th, by reason of the death of [the husband], and that at that time no decree had been entered, and that there was no record evidence to justify a *nunc pro tunc* entry of a decree afterwards, and the judgment of the California court was void." *Id.* at 1019.

It appears that the result reached in *Young* was predicated upon the fact that the "record" of the events in the trial court, prior to the husband's death, came solely from the testimony of attorneys present, that no final determination of the case had been arrived at because the court said it "would" grant a divorce, and issues were reserved for later determination, and that in order for there to be a "final judgment" in California, it was necessary that there be either written findings of fact or a waiver of that requirement. *Id.* at 1018. The *Young* court stated that "it plainly appears that no judgment had been determined upon—much less, announced, or any memorandum made—before the action

abated by the death of the plaintiff." *Id.* at 1017. In making that statement, the court seems to have implicitly acknowledged that a record reflecting the determination and announcement of a judicial decision on the issues necessary to avoid abatement, prior to the death of one of the spouses, *would* be a sufficient basis for entering a *nunc pro tunc* judgment to "reverse" such an abatement.[5]

*Levy v. Winans,* 464 S.W.2d 763 (Mo. App.K.C.Dist.1970), was also a dissolution case in which the issue was whether the trial court correctly denied a motion for the entry of a decree of dissolution *nunc pro tunc.* At the conclusion of trial, the court stated that the wife was "entitled to the principal relief sought, a decree of divorce," but that "no decree [would be] entered at this time but only the findings and conclusions just now reached." *Id.* at 764. A similar "minute book entry" was made which included the notation "Not a decree at this time." *Id.*

Significantly, the *Levy* court referred to the transcript of the trial court's comments in determining whether there was a record of the action actually taken sufficient to support a *nunc pro tunc* order. The court found, based upon that transcript, that the trial court did not "render" a decree and did not intend to enter a judgment. *Id.* at 767. Acknowledging the appellant's contention that *Young* stood for the proposition that if the court's oral finding in that case (that it "would" grant a dissolution) had been reduced to writing, it would have

been sufficient to authorize a *nunc pro tunc* judgment, the *Levy* court, nonetheless, held that such a conclusion did not necessarily follow, since an "oral announcement that the court would grant the divorce, coupled with a continuance for determination of allowances for child support and attorney fees, was not sufficient to authorize entry of a *nunc pro tunc* judgment of divorce." *Id.* at 765.

■ Our reading of *Young* and *Levy* compels the conclusion that a pronouncement that the trial court "would" grant a divorce, or that one of the parties is "entitled" to a divorce does not amount to a "rendering" of a decision or judgment. We also consider *Levy* significant in that the transcript of the trial court's comments in that case was considered in determining whether there had been a judgment "rendered." In the instant case, unlike in *Young* and *Levy,* the trial court announced that "[t]he marriage is dissolved." This announcement was direct and, in our opinion, constituted the rendering of a decision or order in the case, in contrast to the statements in *Young* and *Levy*—announcements of what the court "would" do or what a party was "entitled" to.

■ By way of summary, based upon *Linzenni* and the other cases cited above, it is not necessary that there be a determination of all issues in a dissolution case prior to the death of one of the spouses in order to avoid a complete abatement of the case, only that the court order that the marriage is dissolved. In the instant

---

5. Our interpretation of *Young* is not universally shared. In *Leventhal v. Leventhal,* 629 S.W.2d 505 (Mo.App. E.D.1981), the court stated, apparently in dictum, that *"an oral announcement by the court will not support the entry of a judgment nunc pro tunc as of the date of the announcement when the formal judgment was entered upon a day subsequent to the death of a party to a divorce action."* *Id.* at 508 (citing *Young* at 1018; *Orchard*

*Container Corp. v. Orchard,* 601 S.W.2d 299, 305 (Mo.App. E.D.1980); *Heil v. Rogers,* 329 S.W.2d 388, 390 (Mo.App.K.C.Dist.1959)) (emphasis added). Based upon our reading of these cases, they do not support that statement. Additionally, and unlike in this case, *Leventhal* did not involve an oral announcement by the trial court before the death of one of the parties to the action.

case, the "Motion to Correct Clerical Mistake in Judgment Pursuant to Rule 74.06(a)" was predicated upon the transcript of the trial court's statements at the conclusion of the March 13, 2001 hearing, and a copy of that transcript was attached to the motion. It clearly records a judicial determination of the issue required by *Linzenni*—that the marriage was ordered dissolved. It is clear that this is what the trial court intended to do in completing the docket entry.[6] Otherwise, there would be no reasonable explanation for the trial court's having marked entries indicating a finding of all the other jurisdictional prerequisites to a dissolution of marriage, a finding on child custody, a finding that no maintenance would be payable by either spouse, and taxing costs against Kristi. The effect of the *Nunc Pro Tunc* Judgment was to supply the determination inadvertently missing from the docket entry—that the marriage was dissolved—with the result that it constituted an "order" as contemplated by *Linzenni*.[7] Accordingly, we hold that the transcript of the trial court's announcement that the "marriage is dissolved" was a sufficient basis in the record to authorize the later *Nunc Pro Tunc* Judgment commemorating that finding. Because the *Nunc Pro Tunc* Judgment, as to that finding, was effective as of March 13, 2001, the date the determination was made, there was no abatement of the entire dissolution action, so that the trial court was not without jurisdiction to enter a judgment of dissolution of marriage.[8] Cody's point advancing the opposite conclusion is denied.

### Trial Court's Jurisdiction to Resolve Property and Custody Issues

■ In the judgment of April 24, 2002, the trial court took the matter of property division under advisement. It was not until the entry of the *Nunc Pro Tunc* Judgment that the court entered a judgment on the property issues, which was followed three days later by the amended judgment from which this appeal flows. The *Nunc Pro Tunc* Judgment could have had a *nunc pro tunc* effect only as to the March 13, 2001 docket entry and its decree of dissolution of marriage, since Respondent's "Motion to Correct Clerical Mistake in Judgment Pursuant to Rule 74.06(a)" was directed only to the failure of the trial court to mark the entry finding the marriage dissolved in that docket entry, and the trial court, in its announcement, only purported to dissolve the marriage. However, the portions of that judgment dealing with the division of property were effective as of the date of that judgment—February 4, 2003. The trial court had control over that judgment for thirty days and could reopen, correct or amend it during that time period. Rule 75.01. This the trial court did when, on February 7, 2003, it entered the amended judgment from which Cody appeals.[9]

---

6. We are cognizant that the trial court also signed the April 24, 2002 judgment that stated that "the marriage ... [was] dissolved as of May 13, 2001." Notwithstanding the obvious discrepancy in dates, the record indicates that the trial court, on March 13, 2001, made a judicial determination that the marriage was dissolved.

7. Rule 74.02 provides that "[e]very direction of a court made or entered in writing and not included in a judgment is an order."

8. Rule 52.13(a)(1) provides that if a party dies "and the claim is not thereby extinguished" the court may substitute parties. Since there was no abatement of the entire action here, the trial court had the authority to substitute Respondent as a party. *Clark* at 13.

9. The parties do not raise, nor do we consider, the issue of the trial court's possible motivation for entering a judgment amending the *Nunc Pro Tunc* Judgment, or whether the trial court complied with the provisions of Rule 75.01 in doing so.

Our conclusion as to abatement does not necessarily mean that the trial court had jurisdiction to decide all other issues. As indicated above, we are obligated to consider, *sua sponte*, whether the trial court had jurisdiction to enter the judgment even though that issue is not raised by either of the parties. *See Cook* at 485; *Bledsoe Plumbing and Heating* at 171.

▮ "Jurisdiction" to adjudicate a controversy falls into three categories: (1) jurisdiction of the subject matter; (2) jurisdiction of the res or the parties; and (3) jurisdiction to render the particular judgment in the particular case. *In re Marriage of Holden,* 977 S.W.2d 951, 954 (Mo. App. S.D.1998).

In the instant case, Respondent's "Motion to Correct Clerical Mistake in Judgment Pursuant to Rule 74.06(a)" was directed only to the failure of the trial court to mark the entry finding the marriage dissolved in the docket entry of March 13, 2001. As indicated above, the *Nunc Pro Tunc* Judgment making that finding was an appropriate use of a *nunc pro tunc* judgment and had the effect of preventing the entire action from abating. The trial court, however, purported therein to enter a judgment on child custody, child support, and division of property issues. We must consider the appropriateness of those actions.

In *Carter,* this court stated that:

an action for the dissolution of marriage may involve not only the issue of marital status, but also the issue of the distribution of property and the issue of the custody of children. When the issue of marital status has been resolved by a decree dissolving a marriage, the issue of the distribution of property is not personal. On that basis, the death of a party after a decree of dissolution has become final does not cause an action pending on the issue of the distribution of property to abate.

The issue of the custody of children between a husband and wife is personal. As stated, if either dies before the entry of a decree of dissolution, the action, including the issue of custody, abates. If either dies after a decree of dissolution, but before an order of custody, the action abates as to that issue.

*Id.* at 322 (citations omitted).

▮ It is apparent, therefore, that while the *Nunc Pro Tunc* Judgment provided, prior to Kristi's death, the order that the marriage was dissolved so as to avoid abatement of the entire action, the issue of property division survived, but the issue of child custody did not. Accordingly, we hold that the trial court had jurisdiction to determine the division of property issues, but not custody, after Kristi's death. Since the trial court did not have jurisdiction to award custody to Kristi, it likewise lacked jurisdiction to award her child support. *See Reed v. Reed,* 62 S.W.3d 708, 715 (Mo.App. W.D.2001); *In re Marriage of Jennings,* 994 S.W.2d 78, 79 (Mo.App. S.D.1999) (holding that a court does not have authority to order posthumous child support).

The portions of the amended judgment dissolving the marriage of Cody and Kristi and dividing property are affirmed. In all other respects, the judgment is reversed.

BARNEY, P.J., and PREWITT, J., concur.